Mr. Trella, when you're ready, you may begin. Thank you, Your Honor, and may it please the Court. This appeal involves, in the case of Tellabs, a challenge to the district court's decision upholding the verdict that the asserted claims of the 681 patent were not invalid, and in the case of Fujitsu, a challenge to the court's decision upholding the jury's non-infringement verdict. Because Tellabs' appeal concerns the invalidity issue, I'll focus on that in this opening part to have the right sequence of arguments, I guess, although I'm happy to address any questions the Court may have about non-infringement at any time, obviously. The question with respect to invalidity turns on what exactly did the inventors here claim. In its main brief at page 21 is one example, but there are many others, Fujitsu summarizes the invention as an optical amplifier with a controller that can distinguish between different causes of variations in input power. The controller will adjust attenuation if the variation is due to an undesirable condition like span loss, and freeze attenuation if the variation is due to adding or dropping channels, all with the goal of keeping power per channel constant. And in the diagram on page 18 of its main brief, Fujitsu marks up one of the patent drawings to show this controller. Now if that were the device the inventors had actually claimed, we might not be here, but it's not. Claim six, which is the independent claim, says nothing about variations in input power, distinguishing among different causes of variations, power per channel, or any of the other capabilities that Fujitsu says the invention has. Claim seven, unlike claim six, does refer to variations in the number of channels, but that's all. And claim eight, the other asserted claim, adds only generic statements about changing an attenuation level to control the level of the amplified signal, but it doesn't say  So I guess you're, I feel like you're sort of moving around the issue, but not addressing the issue. So I guess you, to prevail on your argument, you have to convince us, and once I'm wrong, that gain used in claim six is gain only of the doped fiber as opposed to gain of the whole optical amplifier? Yeah, I believe that's correct. Okay, so tell me, let's look at claim six, because claim six says an apparatus comprising an optical amplifier with a gain. An optical amplifier with a gain. Claim six, interestingly, actually doesn't even claim the doped fiber. It's not even anywhere in here. Right. So we're talking about an optical amplifier with a gain. We're talking about an optical filter making the gain, substantially even, a controller which controls the gain. I mean, it seems to me that this claim doesn't have anything to do with doped fiber, and the gain that is being referred to is, quite clearly under the language of the claim, the gain of the optical amplifier. Well, I think... So, why not? Well, that's clearly Fujitsu's argument, and here's why we... Actually, it's my question. Well, you're correct. It's your question also, and I'll try to answer your question. If you look at the claim, first of all, the way that this thing, the way this invention is supposed to control the... I don't care how you think the invention's supposed to control anything. Okay. I care what the claims say. Fair enough. So tell me why, looking at this claim, which says, an optical amplifier with a gain, I'm now supposed to assume that the gain they're talking about is limited to only the gain of the doped fiber, which is not even claimed, of an optical amplifier, as opposed to the gain for the amplifier itself. Well, if we start with what the district court said the ordinary meaning of gain is, the court said gain is a measure of the amount of power an optical amplifier provides to an optical signal, and made clear that what that means is the power supplied by the doped fiber, and that's at A11336, where the court says, in other words, the power in the form of the absorbed pump light is transferred to the optical signal and produces, quote, gain, i.e. amplifying the input signal so the signal has more power at the output than it had at the input. So the court itself said that gain is what the doped fiber is providing, and if you also go back, now going back to the language of the claim, then you see the optical attenuator which controls a level of the amplified WDM optical signal. And I know you don't want to hear about what the claim is supposed to be doing, but let me just, with your court's permission, do that for one second. It's the attenuator which is the key to holding power per channel constant. As Fujitsu reads the claim, the attenuator freezes when the number of channels changes, which allows the power per channel to stay constant. Now the attenuator is controlling the amplified signal, that's the signal after gain has been added to it. If you look at the last clause of Claim 6, which talks about the controller which controls the gain to be approximately constant, it's controlling something else. It's not controlling the amplified optical signal, because that's separately called out in the claim. So there's clearly a distinction between the two. We know from the court's, pardon me, claim construction order that the gain is what's provided by the laser pump and the erbium doped fiber. So what's the limitation with respect to the doped fiber? I mean, you went back to Claim 6 and I just, show me where you find the basis for the argument that this is limited to the doped fiber. The claim language doesn't refer to a doped fiber, of course, but I don't think there's any dispute that what this claim is about is an optical fiber amplifier. When we construe, when we're in the construction analysis, I mean, we're looking at the plain meaning of the words first. Correct. And if it's, the words aren't even, the limitation that you want us to find disclosed in the claims are, the words are not even used, I mean, where does that take us? Well, I think, I have a couple of things to say, Judge Arena. One is, pardon me, the district court clearly thought that this was about doped fiber type amplifiers. Otherwise, he wouldn't have gone through this explanation of what gain is in the claim construction order. And the other thing is, I'm not even sure that it matters, because again, the point here is, what is the attenuator controlling versus what is the controller controlling? The controller is controlling gain, the attenuator is controlling the amplified WDM signal, which is the signal after gain has been added to it. So whether the gain is being supplied by an erbium doped fiber or something else, the attenuator is working on the signal after the gain, wherever it comes from, has been added to it. And that's the key here, because it's the attenuator that makes this thing work under Fujitsu's own explanation. So did the court actually make a construction, an official construction on gain? Well, here's how that unfolded. So in the Markman order, which is what I had just quoted from, the parties hadn't asked, hadn't identified gain as a term that needed to be construed, but the court, in the context of explaining the invention, provided the statement concerning gain at 11-336 that I just read. Then about two months before trial, maybe three months before trial, Fujitsu filed a motion across the entire optical amplifier as opposed to the gain across the amplifying medium only. That's at A-14-231. But at the end of the day, the court never did construe that, correct? Well, the court denied that motion, and what the court said was that the, let me get this language exactly right, and this is at A-15-205, the court said gain means the amount of power an optical amplifier provides to an optical signal. So to the extent, I don't know if you call that a formal claim construction or not, it wasn't in the Markman order, but it was in a court order denying the Fujitsu motion. Was it on the list of construed claims that went to the jury? It was not. The jury was not given a formal construction of gain. When I look at the record, the jury heard testimony from the experts as to, and there was dispute between the parties as to what gain meant, and it seems like it was left to the jury to determine that construction. Well, I'm not sure that's right, and actually you raise an interesting question here, because we have a construction by the court, which admittedly wasn't given to the jury. Did either of you object that the jury instructions were incomplete by virtue of not including this construction? No. Neither side objected, Your Honor. But we have a determination of a legal issue, what this term means, and if the verdict can't be reconciled with the meaning of that term, then the verdict can't stand. It obviously would have been cleaner had the instructions included that, but neither side insisted on it. I suspect because the dispute arose just shortly before trial. You are coming up on your rebuttal time, and since you didn't touch upon infringement, do you want to be careful to save it? I appreciate that, Your Honor. Yes. Let me save my rebuttal time, and I'll address infringement at that point. Thank you. May it please the court. I want to comment on something Teleb's counsel just said, and Judge Rayner, you picked up on it. The court left it to the jury to decide how to apply gain as a term of ordinary skill in the art. And in that regard, Fujitsu did ask the court for an application construction, but didn't receive it, and left it to the jury to decide how gain was to be applied. And in this instance, the term gain itself really isn't in dispute. Gain is a simple concept. Neither party disagreed with the notion that gain means the ratio of output power to input power. So if you've got two units of power coming into an amplifier and ten units come out, you've got a gain of five. Two into ten goes five times. The question, as Judge Moore noted, is what is this gain applied to? The claim itself clearly says the gain is the gain of the optical amplifier. Even the analysis of the term that Teleb's counsel read to you talks about gain being the gain of the optical amplifier. That's what's at issue here, the gain of the optical amplifier, and is that gain held constant? In this instance, the jury found that the prior art did not disclose a system that was capable of holding the gain constant in the face of a variable channel count. I want to step back for a moment and summarize this issue as I see it from the prior art standpoint. What we have here is prior art that was developed by the very inventors who patented the 681 invention, Mr. Sugai and Mr. Kinoshita. They were the ones who developed the prior art that's being used against them by Teleb's. That prior art was developed for a fixed channel count system, that is, a system in which the number of channels being amplified never varies. That was the old way of doing things in an optical communication system. They discovered, as time marched on, and variable channel count systems came into being, such that they could handle different amounts of traffic, that a fixed channel count amplifier could not successfully handle variable channel counts. Variable channel count, by way of reference. On Mother's Day, you've got a lot of phone calls going on. You add channels because you need more channel capacity. After Mother's Day is over, you drop them. Variable channel count, that's what it is. And a fixed channel count optical amplifier could not handle that kind of a system. So therefore, they came up with an invention. Spent a year on it, and that invention became the 681 patent. And that invention was designed to hold gain constant in a variable channel count environment. That's something the prior art did not do. Now, there really are two grounds here upon which the jury's verdict can be sustained, the jury's verdict of validity. One deals with the gain question that Telex Counsel was discussing with you briefly at his turn for podium. But there's also another key limitation that was not met here. That is, the optical amplifier has to amplify a signal with a variable number of channels. The jury found, and Judge Holderman Blow found support for the jury's finding, that the prior art did not disclose an amplifier that amplifies a signal with a variable number of channels. Now, Telex's argument in response to that is to say, well, inherently, fixed channel count systems had variable channels. They had variable channels because, Dr. Wilner's testimony. No, this is Dr. Buckman's testimony, Telex's expert. The variability in the number of channels in a fixed channel count environment came about through accident or malfunction. That is, Larry the backhoe driver is digging a hole in the street and cuts into a cable. And a lot of channels get destroyed. Or the lasers that originate the channels burn out, and so channels drop. That's a malfunction in the system creates a variability in the number of channels. But that's not inherent. That's merely a possibility. In fact, you build your systems, you hope that Larry the backhoe driver doesn't destroy the cable. You hope that the lasers don't burn out. If they're properly maintained, they won't. So there will be no inherent change in the number of channels. A possibility, yes, if there's an accident somewhere or a malfunction in the system, but no inherency. And more to the point, even if there were to be such an accident or a malfunction in the system, the fixed channel count optical amplifier would not work when this change in channel count happens. This is a little bit like, this is a simple analogy, and I apologize if it's a little bit out of school, but it's like having a patent for a vehicle that transports passengers that can transform from four wheels to three wheels to two wheels. Or back again, depending on how many passengers you load into this vehicle. A tele-app's position with respect to the 681 patent is to say, well, an old-fashioned fixed four-wheel car is anticipated prior art because if you drive it down the street and it hits a puddle and a wheel falls off, you're going to have a three-wheel car. Or if the axle falls off in the back, you're going to have a two-wheel car. Therefore, that's a variable wheel vehicle. Well, it's not a variable wheel vehicle. It's a vehicle that suffered a malfunction or an accident. And then it doesn't work after that. It grinds to a halt in the street, which is just what a fixed channel count amplifier does when there's a variable channel count feed into it. Your analogy seems awfully, quite frankly, similar to your infringement argument. The wheel falling off, catastrophe. The 100-microsecond 31-channel drop, catastrophe. Can I ask you to move to the infringement argument? Certainly. Yes, the situation with respect to infringement does involve a catastrophe. And the reason that that's important from an infringement standpoint is because the only evidence that tele-apps presented down below was a catastrophic situation where under that catastrophic condition, a phenomenon known as a transient gain spike occurred. Well, can I ask you, I just want to make sure that I understand the terms that we're talking about. This issue is related to approximately constant in the claim, where the gain has to be kept approximately constant, right? And is it correct that both parties agree the gain has to be held constant when channels are being added or dropped? Yes. That's what's anticipated here. Approximately constant, yes, Your Honor. Yeah, approximately constant during that time. And so I read the patent, and it's really interesting in that it's proactive. Every embodiment in the patent, what this patent clearly does, is affirmatively protect gain in advance, it says clearly, of channel changes. It's like proactive. What the accused product, it seems to me, clearly does is reactive. It notices a fluctuation in input power, most likely attributable to a channel change, and then it responds reactively by holding the gain. In fact, what it does is restore the gain to what it had been a second earlier. That's the way in which it reacts. And so the question is, is it approximately constant during channel change? In terms of what this patent discloses, describes, and means by that, I find it hard to conclude that the jury's verdict isn't supported by substantial evidence because the accused product is reactionary. So there's this period of time during which the gain isn't constant because the algorithm hasn't kicked in to restore it. Your Honor, I respectfully disagree with your analysis. What happens is there's a gain setting that's in place, and that gain setting is not disturbed throughout the interval when there's a change in channel count. Are you talking about the accused device? Yes, the accused device. Why don't we look at the testimony of Dr. Wang, or Mr. Wang. He, as I understand it, is the third party that designed this. Is that right? I don't know. Mr. Wang was an attorney down below. Mr. Sugaya was the engineer who appeared at trial and testified about his invention. Okay. Whose testimony then is this at page 16701? Can you tell me what that is? Did this not appear before the jury? The Wilner Direct. I'm sorry. I apologize, Your Honor. I don't have the full record with me. You don't have your appendix? No, I don't, Your Honor. You came to court without an appendix? I apologize. I have a selected portion of the appendix. Do you have an appendix you could lend him, Mr. Trello? Thank you. 16701. This is the direct testimony of Mr. Wilner. Dr. Wilner. Dr. Wilner. Yes. Yeah, I said Mr. Wang because I saw his name there, but he's the questioner. I got it wrong. He's the attorney-questioner. This was presented to the jury, correct? Correct, Your Honor. Okay, so 16701. It's in Intel Labs Volume 3. You don't have it? Oh, very funny. You can borrow it. I apologize, Your Honor. Mr. Trello probably has two copies, as you all said. All right, so in this testimony, it explains quite clearly how the accused device works. Look at 16700 at the top. Measuring input power. There's a change in input power below some stab level, which means stability level. It's really just short for stability level. I guess I should have kept reading. If it's below that level, it will assume it's a change in span loss, and it will update the gain after one second by changing the variable optical attenuator. And if you keep reading throughout this page and the next page, it is quite clear to me from this testimony that the way the accused product works is it checks every one second to make sure the gain hasn't changed. If the gain has changed at the end of one second, the AGC kicks in and it reestablishes the gain that it had measured one second ago. So it's a time lag of one second in which it then restores the old gain. I mean, look on 16701. Answer. Well, no. The algorithm tells you it will not calculate a new gain. It will keep the old gain from a second ago if it thinks that change is due to the change in the number of channels. And as he explains it, it all triggers to input power, which is usually a positive change in channel. So I guess my question to you is the gain has changed. There's an entire second before it is restored, according to this testimony. Why couldn't the jury have believed that that second of lack of constancy in gain is more than adequate to find the product not infringing? The gain doesn't change, Your Honor. The gain setting is identical. At a time before the change is identical, the gain changes or it wouldn't kick in. That's the transient spike. That's not what this algorithm is talking about. The transient spike is something that happens in an erbium-doped coil where because there's a sudden change in power, this is not the gain-setting algorithm that's reacting. What's reacting is the automatic gain control circuit that controls the power in the erbium-doped fiber. And because it's a real-world system, it always takes a moment to catch up, or in this instance, a millionth of a second to catch up. And so while the AGC is catching up, there'll be a little transient spike in the gain that'll quickly be brought back down again. Not by the algorithm. Not by the algorithm. The algorithm is what's setting the gain set point. And that gain set point, before there's a change in channel count, is at position X or value X. And then there's a quick... We'll assume there's a change in channel count at that point after the previous one-second measurement. There's a change in channel count. The AGC quickly moves to correct that change in channel count. There's this little transient spike. It's the transient spike theory. Now, this is what I don't understand. When you say quickly, yeah, I understood that in the context of the 100-microsecond embodiment where 31 channels are dropped. But it just seems from Mr. Wilner's testimony that the way that this works is that it checks every minute. Every second. Sorry, every second. That isn't super quickly, especially not in electronic terms. And so I'm confused. Well, we have this one-second check interval. The gain is set at that point. Let's just say the gain is set to three, just for the sake of argument. Then, before the next second interval happens, there's a change in channel count. The AGC reacts as quickly as it can to clamp that. It sees a change in power, so there's this spike that happens. Yeah, but it only checks every second. So the input power could have changed a whole second ago or 0.999 of a second, and it only is when it checks a second later that it notices. The AGC is not checking anything with respect to the gain set point. The AGC is operating on its own, and it just simply maintains... Yes, but it doesn't click on until it's told to click on when somebody, each second, checks to see if the input power has changed. The AGC that controls the power to the fiber is on at all times. It's on at all times. It just simply runs there, and it's providing a certain amount of fiber power gain, and it continues to provide that throughout. It isn't changed. It's always a constant ratio between the input power and the output power, of the fiber, and the gain set point that Dr. Wilner is talking about here is the gain control algorithm, which is a different algorithm than what controls the AGC. And that gain control algorithm is what's controlling the VOA, the variable optical amplifier, and that's what you want to keep constant when there's a change in channel count. You don't want to shift the VOA setting when there's a change in channel count. So between these one-second measurement intervals, the gain is holding constant, the transmissivity of the VOA is holding constant. If, between the one-second intervals, there's been a change in channel count, the system determines there's been a change in channel count and keeps the gain... Well, actually, the system never determines it will be a change in channel count. The system determines whether the input power has changed, and since there's such a high degree of correlation between a change in channel count, the system assumes, right, that it's... Correct. It's going to be clear, because I thought I understood technologically how this is working, and so I want to... You're telling me I don't. I mean, look on page 459, the answer to his question, right after it says overruled, and the witness answers, OK, well, if the change in the input power is greater than the stability level, then the amplifier transforms into this automatic gain control mode. So it wasn't in automatic gain control mode before. The AGC was not operating, at least according to this testimony, until the input power was determined to reach a stability level problem. The automatic gain control mode is not the mode that controls specifically the AGC. That's where the confusion is coming from, perhaps, Your Honor. The automatic gain control mode is a software algorithm mode to tell you whether you should be in the automatic control mode for the VOA, or you should just let the gain, the AGC circuit controlling the EDF power pump, do its thing. So that may be where the source of the confusion is coming from. The AGC circuit is always on. It always operates, regardless of the software mode, whether it's AGC mode or APP mode, automatic power mode or automatic gain mode. The AGC circuit is always running, and it's that AGC circuit that has a small lag in the electronics when there's been a change in the input power to clamp back into whatever power ratio is pumping into the EDF, the erbium-doped fiber. So what we have here is a system which never changes the gain set point if there's been a change in channel count. The transmissivity of the VOA never changes if the power fluctuation is deemed to be a power fluctuation due to a change in channel count, and the system continues running with a constant gain throughout. There is this transient spike which occurs... I'm sorry to belabor this. I totally understand your transient spike argument. I promise I do. But the 458 at the top, lines 3 and 4, when he's explaining again, it says so every one second it's going to be calculating what gain it should hit. What is it talking about then? It's talking about the VOA control. The variable optical amplifier. Excuse me. I apologize. Variable optical attenuator. There are two components that control... that relate primarily to gain and optical amplifier. One is the erbium-doped fiber that's pumped full of power to increase the power of the optical signal passing through it. And then there's the variable optical attenuator or VOA. That's one of the elements called for in the claims. And that is like a window shade that throttles the power back and forth. This is a little bit of a Goldilocks story. You want the power coming out of the optical amplifier to be just right. You don't want it to be too much or the ones and zeros start to blend together in the signal and you don't want it to be too little or the signal will never get to the downstream node where the next amplifier is. So you want to hit that power setting just right. And so you move the window shade up and down to let more or less power through so you hit exactly the power point you want leaving the amplifier. That's what the amplifier gain is all about. You want to adjust that VOA to adjust the amplifier gain to make sure you hit the constant value when there's a changing channel count. But he says that what this is going to do is update the gain after one second by changing the variable optical attenuator. Correct. And as I may have misspoken, variable optical attenuator is what I meant to say, the VOA as the exact name goes. And so this algorithm that Dr. Wilner is talking about is the VOA control algorithm which in a fixed channel count system would cause the VOA to change when there was a change in channel count coming in and thereby resulting in a wrong power output from the amplifier. But in the invention of the 681 patent as claimed in the 681 claims, this VOA is kept constant. The gain of the optical amplifier is kept constant when there's a change in channel count. And the algorithm here speaks to that VOA control, not the AGC control. Well, I mean, if gain is kept constant, then why would he say the following? And as you can see, if delta PN is greater than the stability level, that's the power, right? Correct. Then the amplifier automatically transforms its operation to AGC mode with the last calculated gain. Correct. So wait, if the gain was constant, why would it have to know what the last calculated gain was one second ago and reinstate that? So that you don't change it. So that you keep it right where it is and instead of saying... No, no, no, because then you would just say don't change it. You wouldn't say calculate it with the gain of one second ago. Because that clearly implies the gain changed in that second. I apologize, we're... I apologize that we're not communicating on this issue. I know, clearly we're not. You have a gain setting at, let's call it, interval A, which is where you do the gain check at interval A. Interval B, one second later, you're going to check the gain again. If, in between interval A and interval B, there's been a power fluctuation caused by, let's say... Channel dropping. Well, that's a different... Okay, a channel drop. Then you're not going to want to change the gain setting at the next interval. You're not going to... You're going to want to update, if you will, the gain setting to be the same thing that it was at time T1, at time T2. Well, you should need to update it if it doesn't change. If it doesn't change, you don't have to update it. It seems to me, when I read this, at the one second interval, it checks if there's been a fluctuation in power, then it restores to whatever the gain was one second ago. And, I mean, goodness, if I'm as bewildered by this, I certainly think the jury could have thought the same thing, and that would be substantial evidence. Whether I'm right or wrong, it seems like it would at least be substantial evidence for a jury verdict, doesn't it? Well, the issue in front of the jury, for infringement purposes, was does this transient gain spike that happens when there's any kind of a change in power to the input, does that prevent the gain from... Well, no, all this was before the jury, right? I mean, this testimony was all before the jury. Yeah. So... What TeleABS didn't have was testimony about how the gain responded relative to this transient spike when the system was operating normally. The only thing they were able to put in front of the jury is this transient gain spike for a catastrophic fiber failure, where all but one of the channels dropped out. Okay, I think that we have your argument. Do you have a closing thought? Because we probably ought to give Mr. Kala a chance to respond. Yes, thank you, Your Honor. I simply want to say again that there were two grounds for the jury to support validity of this patent. One of them is that there's no optical amplifier in the prior art that is able to handle variable channel counts and successfully amplify those variable channel counts. And the second is the gain issue that we have discussed. Thank you, Your Honor. Thank you very much, Mr. Kala. You have five full minutes of rebuttal, and poor opposing counsel, I dragged him over six more minutes. So if you end up going over... Oh, yeah, I will try not to use this. But I have my appendix there. Sure. Just in case I need it. Let me start with infringement. And Mr. Brooks used three phrases that I think are really the key. One is the gain setting doesn't change when he's talking about the accused product. Another one is it reacts as quickly as it can. And the third phrase he used was Telabs had no evidence concerning how it would operate if channel count changed during normal operation. As to the last one, not our problem. We didn't have the burden of proof on infringement. This was Fujitsu's burden. So if there was no evidence about that, that just underscores the failure of proof. The core problem with Fujitsu's infringement theory and the arguments today, really you can see on page two of their reply brief, where Fujitsu says the MEAM controller, that's the accused product, keeps its gain constant following a change in channel count. The asserted claims, as Mr. Brooks confirmed a few minutes ago, all require that gain be held constant during the channel count. While the channels are changing, the gain has to be kept constant. So even accepting Fujitsu's own description of the accused product, infringement wasn't shown. The evidence established that the MEAM works by allowing the gain to vary so that output power is held constant and not by controlling gain to be constant. Now when there's a large change in input power, such as when the number of channels changes, and this gets into the switching from one mode to the other mode, the MEAM then will adjust the gain so that the output power can vary. But in that situation, the MEAM controller adjusts the gain only after the number of channels has changed. And Judge Holderman... ...changing the input power above the stability level. It doesn't measure channel... That's exactly right, it doesn't measure, but it presumes that when there's a change in input power above a certain magnitude, probably the channel count changes. And that's a reasonable assumption, but if you're telling me how the accused infringing product... You're right. To be precise, it senses a change in the magnitude of the input power. But the MEAM, again, what it's doing, and Judge Moore, you used the right term, I think, reactive. It cannot hold gain constant while the change is occurring because unlike the system that's described in the 681 specification, there's no advanced warning mechanism. There's no, I think it's called a monitor control circuit or monitor warning circuit or something like that in the 681 specification that in that convention basically tips off the amplifier that, hey, a change is coming, so be ready. Here, there's nothing like that. Here, the MEAM can only correct the gain after the change has occurred. Now, it corrects quickly, to be sure, but it's only after the change, which is not what the claims require. And there's no doctrine of equivalence theory here, so the fact that it may react quickly or soon after a change doesn't matter. This is a literal infringement case only, and there just is not literal infringement here. And it makes no difference which understanding of gain you have, whether it's just gain across the EDF or gain of the entire device. Now, are you suggesting, I'm just going to ask you bluntly, look, I do not claim to be one of skill in the art in this technology, but when I read Mr. Wilner's testimony, I thought I understood it. Just be honest and tell me, am I mixing it up? What is your understanding of his testimony that I read and kept going back to? I think, Your Honor, I think you have it essentially correct. And I think Mr. Brooks may have put his finger on part of the confusion, which is the difference between AGC mode and the AGC component. But what happens is, in normal operations, the MEAM is in what's called automatic power control mode, or also ALC, automatic level control. And that's what it's checking every second. And for the sort of normal fluctuations, and what it will do… Would that be change in channel? No, no, no. Something other than that. And then when there is a dramatic change in the input power, above the stability level, then it kicks the software changes into the automatic gain control mode. I guess, but here's my problem. When you hit the stability level, a dramatic change in input power, that is because the channels have added or dropped. Correct. So the gain's already changed. And if it's only checking every one second, that's why I kept saying we will update the gain to the gain it was one second ago. Well, that has to imply that it isn't actually staying constant. You're right about that. The mechanism's a little different, though. When there is the dramatic change, so that the change is more than the stability level, this normal one-second monitoring thing doesn't apply. It basically kicks into this separate mechanism. So basically, at timeline point B, it notices this input and it kicks into a separate mechanism. Right. But during that one second, which is during the variability in channels, you have had, potentially, lack of constant gain. Correct. During, whether it's one second or 100 microseconds or whatever, Well, it could be as long as one second. It could be. It could be checking every one second. So it could be as long as one second. But again, to be clear, in the automatic power control mode, it's checking every second. There's a separate mechanism. If there is a dramatic change, that's noticed separately. And it feeds into, then, this automatic gain control mode and all of that. Okay. But the basic point is still the same. The change has already occurred. And although Mr. Brooks refers to it as this transient spike, it is the only evidence in the record about what happens when the number of channels changes. And what happens is that there is a variation of three times the allowable variation in the gain. It's this 0.8 decibels. Now, in their brief, Fujitsu tries to dismiss that as just a little pimple. It's insignificant. But in fact, it's three times the allowable variance. There's no reason a reasonable jury couldn't conclude that that makes it not approximately constant. And even if you take their comparison, which is you should compare the 0.8 to the total gain, in their brief at page 71, they say, well, that's only one-fifteenth. That's six and two-thirds percent. Even that, a reasonable jury could certainly conclude that a variance of that much means that the gain is not approximately constant during the change itself. As I said, it will revert to constant gain afterwards, but the claims require that gain be held constant during the channel change. And this device does not do that. It's not how it works. Is part of your argument that even if the gain doesn't have constancy for, what is it, 100 microseconds, 200 microseconds? Something like that. That it was up to the jury to decide whether that amounted to constant or not. Do they introduce any evidence of how quick 100 microseconds is that would have made it unreasonable for the jury to conclude that that results in a lack of constant gain? No, no, absolutely not. There's nothing like that. And to the extent there's any evidence at all, it's about, and I don't think anybody put numbers on it, but how incredibly quick electronic devices react. That's my point. Believe it or not, we see a lot of claims that talk about doing things in real time. Well, electronic devices, as you know, are not capable of doing things in real time instantaneously or whatever, and so there's always a degree of, well, how long of a lag is one of skill and the art going to recognize as satisfying a real-time response rate and how long it's not. And what I'm wondering is, does this record, because I couldn't find anything, does this record contain testimony like one of skill and the art would recognize that 100 microseconds is still constant, or one of skill and the art would recognize 100 microseconds is not constant? No, there's nothing like that. What we have is we have the claims construed to require that the gain be constant while the channel count is changing, not after, and we have just undisputed evidence, but that's not the way the accused product works. The accused product corrects the gain after the change has occurred. So that's what the jury was given, and among it the testimony Your Honor was referencing earlier. That's the way the product works. It's reactive. It fixes the gain after the change has occurred. How long after? I don't think it was quantified in the record, but pretty quickly, but it's afterwards. But the claim requires approximately constant, so I'm listening to this exchange and I'm going back to Figure 4 and Piduch's argument that the Mion product infringes when it's at least in its automatic gain control mode. I mean, because we're dealing with timing now, and maybe even nanoseconds, but what happens, for example, when there's a transient error band? Let's say that all channels are knocked out or the cable is cut. Well, let's say there's one channel left, because then you don't have any gain, nothing's happening. Well, then you have Figure 4, which is from the, and this is the interval when the channels are changing, and this is what's happening to the gain during this interval. It is spiking. Right, and that's during the precise interval when the claims say it has to be constant, and the magnitude is such that a reasonable jury could certainly They didn't say constant, they said approximately constant. Right, and a jury could certainly conclude that a deviation of six and two-thirds percent at the precise time when it's supposed to be approximately constant is not holding it approximately constant. And the jury was instructed that approximately constant was an issue given to the jury. There were no parameters put around it, and so what you had was experts talking about what's happening during the actual channel change. You made a specific finding on that, the jury did not. I think that's right, Your Honor, yes. And Judge Holderman, in his opinion, and I think it's appendix pages 8 to 12 or something like that, basically marches through the evidence and how a reasonable jury could certainly conclude the gain was not approximately constant during the required interval. Well, we're pretty close. And I used the time that I said I wasn't going to use. I'm going to conclude today. Thank you both, thank both counsel, in case it's taken under submission. Thank you, Your Honor. All rise.